UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/16/06

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

TODD CONWAY,

                Plaintiff,

        - against -

MICROSOFT CORP. and TOM LEACH,
in his individual and official capacities,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

04 Civ. 3346 (RJH)

**MEMORANDUM OPINION
AND ORDER**

Todd Conway brought this action against his former employer, Microsoft Corporation ("Microsoft") and Tom Leach, an employee of Microsoft, asserting claims of discriminatory discipline on the basis of his race and gender in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), New York Human Rights Law, N.Y. Exec. Law § 296, and Title 8 of the Administrative Code and Charter of the City of New York, N.Y.C. Admin. Code § 8-107 et seq. Conway further asserts claims of retaliation and constructive discharge resulting from his complaint of sexual harassment to Microsoft, in further violation of Title VII, Section 1981, and New York law. Conway's remaining state law claims assert a violation of a duty not to act negligently, recklessly or carelessly, and/or with callous indifference toward him, negligent hiring, supervision and/or retention, breach of contract, and tortious interference with contract. At oral argument on February 8, 2006, plaintiff withdrew his claims alleging gender discrimination, and all state law claims unrelated to race discrimination. Microsoft and Leach have moved for

summary judgment on all claims asserted by Conway. For the reasons set forth below, the Court grants defendants' motion for summary judgment, thereby dismissing this action in its entirety.

## BACKGROUND

Unless otherwise indicated, the following facts are undisputed and taken in the light most favorable to plaintiff.

1.    Plaintiff's Demotion

Conway is an African-American male who was hired to the position of Technical Account Manager ("TAM") by Microsoft in 1998. (Conway Aff. ¶¶ 2, 4, Pl.'s Ex. 1.) On January 13, 2003, Conway was promoted to the position of Premier Support Manager ("PSM"), a position that involves supervisory responsibility over a team of employees. (Conway Aff. ¶ 4; Defs.' Statement of Material Facts Pursuant to Rule 56.1 ("Defs.' 56.1 Statement") ¶ 13.) As a result of this promotion, defendant Leach, who has held the position of Group Manager since 2000, became Conway's manager. (Conway Aff. ¶ 5.) In addition, as part of Conway's supervisory responsibilities, Peggy Quirke, a TAM, became Conway's direct report. (Id. at ¶ 6.)

Between the months of January and March 2003, Conway and Quirke engaged in three sexual encounters. (Id.) The first encounter occurred in Conway's Charlotte, North Carolina hotel room on January 22, 2003. (Defs.' 56.1 Statement ¶ 19.) The second encounter occurred on February 27, 2003 in Conway's car, outside a hotel in Scottsdale, Arizona where Conway and Quirke were staying separately in connection with a Microsoft training event. (Id. at ¶¶ 24, 31.) The third and final sexual encounter occurred on March 21, 2003 at Quirke's home in Charlotte, North Carolina. Having a

relationship with a subordinate was a violation of Microsoft policy.[1] That policy provides:

> You should not directly supervise a spouse, domestic partner, other family member or relative. If you nevertheless find yourself in a position of supervising, or being supervised by, a spouse, domestic partner, family member or relative, you should report the situation immediately to your manager and HR generalist. In such circumstances, Microsoft will assist you or the other person in finding a new position within the company, but there is no assurance that such a position will be secured.
> . . .
> While not specifically addressed above, the same considerations apply to situations in which you are romantically involved with another person and he/she seeks employment at Microsoft, works in your group, or is supervised by you.

(Microsoft Employment of Relatives, Pl.'s Ex. 10.) This policy is captioned as "Employment of Relatives," although by its terms is extended to cover personal or sexual relationships.

Conway did not report his relationship or request a reassignment for himself or Quirke at the time the encounters took place. However, Conway did inform Leach and Cullene Bury, a Human Resources generalist, of his relationship with Quirke in August 2003. (Conway Aff. ¶ 7.) Conway's disclosure was precipitated by a confrontation between himself and Quirke during her August 22, 2003 annual review. (Conway Dep. 288:08–25; Pl.'s Ex. 2.) Quirke was upset about her review, and threatened to disclose their relationship to Leach. (*Id.*) Conway responded that he would "beat [her] to it." (*Id.*) Later that evening, Conway received a number of emails from Quirke, demanding that he revise her review. (*Id.*) Conway told Leach about his sexual encounters with Quirke on August 26, 2003. (Conway Aff. ¶ 9.) Following Conway's disclosure to

---

[1] Conway testifies in his affidavit that he was not aware of the policy at the time of his demotion. (Conway Aff. ¶ 12.) However, he also concedes that he knew his "actions could be detrimental," and that he "was willing to accept whatever the consequences" would be. (*Id.* at ¶ 15.)

Leach. Leach instructed him to contact Bury in Human Resources. (Defs.' 56.1 Statement ¶ 54.) Subsequently, Leach decided to demote Conway, and informed him of this decision by telephone September 4, 2003. (Conway Dep. 308:12–309:25, Defs.' Ex. 5; E-mail from Todd Conway to Cullene Bury and Tom Leach (Sept. 8, 2003, 12:06 PM), Defs.' Ex. 8 (noting in subject heading that conversation with Leach occurred September 4, 2003).)

Conway objected to his demotion, and complained to Leach several times that other managers, specifically Melissa Bodenstaff and Ray Ivey, had engaged in relationships with subordinates and kept their jobs. (*See* E-mail from Tom Leach to Cullene Bury (Sept. 12, 2003, 12:32 PM), Pl.'s Ex. 11.) An e-mail exchange between Leach and Bury indicates that in response to Conway's disparate treatment complaint, Leach had informed Conway that Bodenstaff and her subordinate, David Allred, "brought this to [his]/HR attention immediately and professionally." (E-mail from Tom Leach to Cullene Bury (Sept. 12, 2003, 1:26 PM), Pl.'s Ex. 11.) With respect to Ray Ivey, Leach's email to Bury indicates only that Conway had mentioned "[s]omething with Ray Ivey." (E-mail from Tom Leach to Cullene Bury (Sept. 12, 2003, 1:35 PM), Pl.'s Ex. 11.) Conway's allegations of disparate treatment go to the heart of the current action, and will be discussed in greater detail, *infra*.

On September 15, 2003, Leach issued a warning memo for inclusion in Conway's personnel file, detailing the disclosures made by Conway and Conway's demotion. (Mem. from Tom Leach to Todd Conway (Sept. 15, 2003) ("Warning Memo"), Pl.'s Ex. 7.) Leach notes that "Managers at Microsoft are held to a higher standard in representing the company and its values" and cites to policies and guidelines for managers and the

4

General Company Guidelines. (*Id.* at 1.) The memo goes on to specifically note that Conway "used poor judgment by choosing to not disclose this information until [he was] concerned that [his] direct report would bring it up as a result of being unhappy with her review." (*Id.* at 2; *see also* Leach Dep. 63:09–14, Pl.'s Ex. 4.)

Conway was officially removed from his management position and returned to his prior position of TAM on October 1, 2003. (Defs.' 56.1 Statement ¶ 58.) Conway's salary remained the same, but the parties dispute whether his stock awards, bonus structure, and potential for future earnings were affected by the demotion. (*Id.* at ¶ 59; *cf.* Pl.'s 56.1 Statement of Material Facts ("Pl.'s 56.1 Statement") ¶ 59.) In addition, Conway's People-Management rating in his annual performance evaluation was revised downward, and he was required to attend harassment prevention training. (Warning Memo 2; *see also* Conway Annual Performance Review 2003, Pl.'s Ex. 8.) The responsive action by Microsoft was based on the information they had received from Conway himself. Leach and Bury accepted Conway's version of events and did not undertake a further investigation to confirm the truth or accuracy of what Conway told them. (Warning Memo; Leach Dep. 234:12–234:13.)

## 2. Plaintiff's Internal Complaint of Sexual Harassment against Quirke

On September 8, 2003, Conway filed an internal complaint of sexual harassment against Quirke via an e-mail addressed to Bury and Leach that alleged he had "enough objective information to show that [he] was being harassed prior to the initial physical encounter on . . . January 22, 2003." (E-mail from Todd Conway to Cullene Bury and Tom Leach (Sept. 8, 2003, 12:06 PM), Defs.' Ex. 8.) Bury responded to the e-mail soon after to inform Conway that she had forwarded his complaint to Microsoft's Employee

Relations Investigations team. (E-mail from Cullene Bury to Todd Conway and Tom Leach (Sept. 8, 2003, 1:51 PM), Defs.' Ex. 9.) The following day Tracy Turman, Investigations Manager in Human Resources, e-mailed Conway to request a video conference to discuss his allegation of sexual harassment. (E-mail from Tracy Turman to Todd Conway and Cullene Bury (Sept. 9, 2003, 5:56 PM), Defs.' Ex. 9.) However, Conway refused to cooperate and declined to speak with Turman about his allegations or otherwise participate in any subsequent investigation. (Conway Dep. 316:02-11.) Microsoft's internal handling of Conway's claim culminated in a memorandum dated October 28, 2003. Therein Turman informed Conway that "based on the information provided to me in this investigation, there is nothing to corroborate your allegation that you were sexually harassed by Ms. Quirke." (Mem. from Tracy Turman to Todd Conway (Oct. 28, 2003), Defs.' Ex. 10.)

3. Defendants' Alleged Retaliatory Conduct and Constructive Discharge

Following his demotion, Conway was reassigned to work as a TAM on Microsoft's account with Citigroup. On October 7, 2003, Conway e-mailed his supervisor Brian Kass to complain of technical problems he had suffered over the previous two weeks in connection to his provision of technical support to Citigroup. (E-mail from Todd Conway to Brian Kass (Oct. 7, 2003, 12:05:57 PM EDT), Defs.' Ex. 11.) He complained of serious hard drive crashes on his laptop and difficulties accessing the hard drive network. (Defs.' 56.1 Statement ¶ 64.) Microsoft's position is that the types of difficulties Conway was experiencing are the types that "occur from time to time." (*Id.* at ¶ 65.) Conway alleges that the problems were caused by Microsoft purposely to undermine his work performance in retaliation for lodging a sexual harassment complaint

6

against Quirke. (Pl.'s 56.1 Statement ¶ 65.) Conway bases his allegations solely on his assertion that an audit on his work-issued laptop revealed that an administrator had accessed his computer, (Conway Dep. 337:16–339:12, Pl.'s Ex. 2), the fact that it was his first unrecoverable crash, (*id.* at 340:11–15), and that no one else was having access problems at that time, (*id.* at 345:25–346:15). Conway further alleges that his demotion combined with his appeared incompetence following his technical difficulties made him believe he was about to be fired, and that he had no choice but to leave his employment at Microsoft. (Pl.'s 56.1 Statement ¶ 68.) Thus on November 7, 2003, Conway resigned his position, effective November 14, 2003. (Defs.' 56.1 Statement ¶ 68.) Conway began working at Morgan Stanley on November 17, 2003. (*Id.* at ¶ 69.)

4.     Plaintiff's EEOC Charge

On November 24, 2003, Conway filed a charge of discrimination with the EEOC. (*Id.* at ¶ 72.) Conway alleged that he was demoted because of his race and complaint of sexual harassment, and was subsequently harassed and retaliated against, resulting in a hostile work environment and constructive discharge. (*See* Letter from Esther Gutierrez, Senior Investigator, U.S. EEOC, New York District Office, to Todd Conway (Feb. 3, 2004) 1, Pl.'s Ex. 24.) The EEOC dismissed his charge, concluding that "[t]here is no evidence that the employer has discriminated against you based on your sex and race. There is no evidence that [Microsoft] retaliated against you as you alleged. Based on the record there was no evidence to suggest that [Microsoft] violated the anti-discrimination laws that we enforce." (*Id.* at 2.) The EEOC decision was issued in conjunction with a notice of right to sue. Pursuant thereto, Conway filed the instant action.

## 5. Conway's Comparators

### a. *Melissa Bodenstaff*

Melissa Bodenstaff is a Caucasian PSM, who has been supervised by Leach continuously since around the middle of 2000. (Leach Dep. 175:03–12.) In May 2003, Bodenstaff, and Allred, a TAM and Bodenstaff's direct report, approached Bury to inform Human Resources that they intended to pursue a relationship outside of work. (Bury Dep. 35:23–37:90, Defs.' Ex. 15; Allred Dep. 217:01–221:17, Defs.' Ex. 16; Leach Dep. 34:23–35:17, Defs.' Ex. 4.) Bodenstaff and Allred specifically referred to the Employment of Relatives Policy in their meeting with Bury, and provided her with a printed copy. (Allred Dep. 218:22–24.) Per Bury's suggestion, the following day they made the same disclosure to Leach, Bodenstaff's general manager. (Bury Dep. 115:13–21; Leach Dep. 218:21.) They reported that they "got along too well," and suggested Allred be moved to another team. (Bodenstaff Dep. 97:06–18, Pl.'s Ex. 12; Allred Dep. 221:09–10.) It is undisputed that Bodenstaff and Allred did not inform Leach or Bury whether this relationship was intimate prior to the time of the disclosure. (Bodenstaff Dep. 98:23–25, 95:02–11, Pl.'s Ex. 12; Allred Dep. 221:18–21, 217:22–218:16, Pl.'s Ex. 13.) Leach testified that he did not ask Bodenstaff and Allred whether they had commenced a relationship or had physical contact prior to coming forward. (Leach Dep. 75:25–76:06.) However, Bury testified that she asked whether they had commenced a relationship and that their response was "No." (Bury Dep. 37:03–04.) Allred does not recall if this question was asked. (Allred Dep. 259:01–07.) In response to their disclosure, Bury wrote an e-mail discussing how the situation should be handled in light of Microsoft's Employment of Relatives policy and noted Bodenstaff and Allred's upcoming discussion with Leach regarding the propriety of moving one of them to

8

another team. (E-mail from Cullene Bury to David Allred and Melissa Bodenstaff (May 5, 2003, 9:01 AM), Pl.'s Ex. 18.) Bury closed the e-mail by praising them for their "openness and honesty by bringing this to [her] attention." (*Id.*) Leach moved Allred to another team shortly thereafter. (E-mail from Tom Leach to Carol Reger (May 22, 2003, 12:00 PM), Pl.'s Ex. 19.)

As became apparent during pretrial discovery, Bodenstaff and Allred had some physical contact prior to their May 2003 disclosure to Bury and Leach. These encounters appear to have been limited to hugging and kissing. The first encounter occurred in February or March 2003 in Allred's truck in North Carolina, followed shortly thereafter with additional kissing and hugging in Bodenstaff's hotel room. (Bodenstaff Dep. 23:04– 19, Pl.'s Ex. 12; Allred Dep. 153:06–23, Pl.'s Ex. 13.) The next occurred in March in a Boston hotel when Bodenstaff stayed overnight in Allred's hotel room. (Bodenstaff Dep. 26:05–27:07, Pl.'s Ex. 12.) Bodenstaff testified that the physical contact did not go beyond hugging and kissing and that the first time she engaged in intercourse with Allred was in July 2003, after Allred was no longer her direct report. (*Id.* at 22:20–21, 26:14.) In any event, as noted, neither Bodenstaff nor Allred disclosed any physical contact at the time of the request for Allred's reassignment. (Bodenstaff Dep. 98:23–25, 95:02–11, Pl.'s Ex. 12; Allred Dep. 221:18–21, 217:22–218:16, Pl.'s Ex. 13.)

Prior to the May 2003 disclosure, Allred was promoted. In January 2003, Bodenstaff e-mailed Leach to nominate Allred for a promotion. (Leach Dep. 177:08–23, Pl.'s Ex. 4.) On February 13, 2003, Bodenstaff issued an evaluation of Allred. (Allred Microsoft 2003 Mid-Year Discussion (Feb. 13, 2003), Pl.'s Ex. 16.) Bodenstaff testified that she had not yet kissed Allred at the time she prepared the evaluation. (Bodenstaff

Dep. 71:19–73:18, Pl.'s Ex. 12.) Leach approved the promotion on April 10, 2003. (Leach Dep. 191:18, Pl.'s Ex. 4.) ).

Subsequent to the May 2003 disclosure, Bodenstaff prepared another evaluation for Allred giving him a 4.0 score. (Allred Annual Performance Review (July 2, 2003), Pl. Ex. 20). Allred complained that his ultimate 3.5 review score was too low, because both Brian Kass (his then-current supervisor) and Bodenstaff (his prior supervisor) both believed he warranted a 4.0 score. (Allred Dep. 238:6–22, Pl. Ex. 13). Leach was responsible for dropping his review rating to a 3.5, because he believed other people at Allred's level had done more significant things than Allred at that point. (*Id.* at 239:5–9; E-mail from Tom Leach to Melissa Bodenstaff and Brian Kass (Aug. 19, 2003, 6:56 PM), Pl. Ex. 21).

### b. *Ray Ivey*

Ray Ivey is a Caucasian manager, employed by Microsoft. In 2000, Quirke complained that Ivey, her PSM at the time, sexually harassed her. (Quirke Dep. 29:04–29:07, Pl.'s Ex. 3.) Quirke testified that when she, Ivey and others were at a Microsoft team morale event, Ivey put his arm around Quirke and told her to "go ahead and stay in the picture. That way I can touch your tit." (Quirke Dep. 17:04–13.) Following her complaint, Quirke was moved to a different position in a different group. (Quirke Dep. 29:04–29:18.) The allegations against Ivey were investigated, and a warning memo was put in his personnel file. (Letter from Sharon Boland and Mary Stokes to Ray Ivey (Aug. 21, 2000) ("Ivey Letter"), Pl.'s Ex. 25.) According to that letter, Microsoft's investigation of Quirke's complaint revealed that he made inappropriate comments at off-site events, that he was prone to drinking and boisterous behavior at those events, but did not mention the alleged inappropriate touching. (*Id.*) The sole disciplinary action taken

pursuant to these findings was the filing of the warning in his personnel file, and a warning that any retaliation against Quirke for filing the complaint would result in immediate disciplinary action. (*Id.*) Ivey did not report to Leach, nor did Leach know prior to August 2003 that Ivey had sexually harassed Quirke. (Leach Dep. 125:20–24, Pl.'s Ex. 4; Defs.' 56.1 Statement ¶ 84.)

## DISCUSSION

1. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986); *see also Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998); *Toriola v. New York City Trans. Auth.*, 2005 WL 550973 (S.D.N.Y. Mar. 9, 2005). A party moving for summary judgment may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

A fact is considered "material" for purposes of Rule 56 if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Whether a material issue is "genuine" depends on whether the evidence is of a type that would permit a reasonable jury to return a verdict in favor of that party.

11

*Id.*; *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003). In making its showing that a genuine issue of material fact exists, the nonmoving party may not rely on "the mere existence of a scintilla of evidence" to support its position, but must instead proffer "evidence on which the jury could reasonably find for the [plaintiff]." *Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004) (citing *Anderson*, 477 U.S. at 252). Although "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," *Abdu-Brisson v. Delta Airlines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001), it is "sparingly used where intent and state of mind are at issue because . . . careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination," *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) (citations omitted).

## 2.    Conway's Discrimination Claims

Conway has asserted claims of disparate treatment and retaliation based race in violation of Title VII and Section 1981. Claims of employment discrimination brought under Title VII and Section 1981 are subject to the same analysis. *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989), *superceded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074 (deciding that burden-shifting scheme developed under Title VII "should apply to claims of racial discrimination under § 1981"). The plaintiff also brings discrimination claims under New York state and city law, which are also subjected to the same analysis as claims under Title VII, and are therefore analyzed in tandem below. *See Abdu-Brisson*, 239 F.3d at 466; *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000) (stating that state and city discrimination claims subject to same Title VII analysis); *Sullivan v. Newburgh Enlarged Sch. Dist.*, 281 F.Supp.2d 689 (S.D.N.Y. 2003).

12

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Courts analyzing discrimination claims under Title VII apply the three step burden-shifting framework originally established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1972). *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005); *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 83 (2d Cir. 1990) (disparate treatment); *Jetter v. Knothe Corp.*, 324 F.3d 73, 75 (2d Cir. 2003) (retaliation). A Title VII plaintiff must first establish by a preponderance of the evidence a prima facie case of discrimination. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 248 (1981); *Woodman*, 411 F.3d at 76. The establishment of a prima facie case creates a presumption of discriminatory animus, and the burden shifts to the defendant to proffer a legitimate, nondiscriminatory business rationale to justify its adverse employment action. *Burdine*, 450 U.S. at 248 (citing *McDonnell Douglas*, 411 U.S. at 802). Once the defendant satisfies this burden, the burden shifts back to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 248. In determining whether the plaintiff has met this burden, the Court must take a "case by case" approach that weighs "'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case.'" *James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000) (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148–49 (2000)). "In short, the ultimate burden rests with the plaintiff to offer evidence 'sufficient to

13

support a reasonable inference that prohibited [race] discrimination occurred.'"
*Woodman*, 411 F.3d at 76 (citations omitted).

a. *Disparate Treatment Claim*

i. Prima Facie Case

Conway may establish his prima facie case of discrimination by showing that (1)
he belonged to a protected class; (2) he was qualified for the position; (3) he suffered an
adverse employment action; and (4) the adverse employment action occurred under
circumstances giving rise to an inference of discrimination. *Feingold v. New York*, 366
F.3d 138, 152 (2d Cir. 2004). There is no dispute that Conway has satisfied the first three
prongs of his prima facie case. The fourth element, however, is hotly contested by the
parties. Absent direct evidence of defendants' discriminatory intent, Conway may satisfy
the fourth element of his prima facie case by "showing that the employer subjected him
to disparate treatment, that is, treated him less favorably than a similarly situated
employee outside his protected group." *Graham*, 230 F.3d at 39. In order for Conway to
show he was subject to disparate treatment, he must show he was "'similarly situated in
all material respects' to the individuals with whom [he] seeks to compare [himself]." *Id.*
at 39 (citing *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997)).

As the Second Circuit explained in *Graham*

[w]hat constitutes 'all material respects' . . . varies somewhat from case to
case and . . . must be judged based on (1) whether the plaintiff and those
he maintains were similarly situated were subject to the same workplace
standards and (2) whether the conduct for which the employer imposed
discipline was of comparable seriousness. In other words there should be
an 'objectively identifiable basis for comparability.

*Id.* at 40 (citations omitted). The *Graham* court further cautioned that "the standard for
comparing conduct requires a reasonably close resemblance of the facts and

14

circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Id.*; *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) ("[W]here a plaintiff seeks to make a minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference may be attributable to discrimination."). Finally, while the determination of whether two employees are similarly situated is normally a question of fact for the jury, *see, e.g.*, *Graham*, 230 F.3d at 39, this "rule is not, however, an absolute. A court can properly grant summary judgment where no reasonable jury could find the similarly situated prong met," *Spiegler v. Israel Disc. Bank of New York*, 2003 WL 21983018, at \*2 (S.D.N.Y. Aug. 19, 2003) (citing *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499–500 n.2 (2d Cir. 2001)).

Here, Conway argues that two Caucasian co-employees, Bodenstaff and Ivey (both of whom continue to hold his former position of PSM) also engaged in conduct arguably prohibited under Microsoft policies, but escaped discipline. Specifically, Conway argues that Bodenstaff concealed a relationship with Allred for months prior to coming forward, during which time she continued to supervise him and nominated him for a promotion. (Pl.'s Opp'n Mem. 2.) Conway also argues that Ivey violated Microsoft policy by sexually harassing Quirke, but kept his job. Defendants argue that Conway is not similarly situated to either Bodenstaff or Ivey, in particular because they did not engage in conduct comparable to his, and further, with respect to Bodenstaff, because there is no evidence that Microsoft had knowledge of her prior physical contact with Allred, even assuming such contact was comparable to plaintiff's behavior. While the

15

Court has serious doubts as to whether a prima facie case has been established, in light of Second Circuit precedent characterizing the plaintiff's burden at this stage as "minimal" and "de minimis," *Woodman*, 411 F.3d at 76 (citation omitted), and the *Graham* court's exhortation to only consider the plaintiff's evidence in deciding whether plaintiff has met his initial burden, 230 F.3d at 42, the Court (ignoring, for the moment, defendants' evidence), will assume a prima facie case has been made.

        ii.    Legitimate Nondiscriminatory Reason

Assuming, therefore, that Conway has made a prima facie case of discrimination, the burden of production shifts to the defendant to proffer a "legitimate, nondiscriminatory business rational to justify its adverse employment action." *Burdine*, 450 U.S. at 248 (citation omitted). A defendant's burden has been characterized as "light," *see Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998), and because it is a burden of "production, not persuasion; it 'can involve no credibility assessment,'" *Reeves*, 530 U.S. at 142. "The employer need not *persuade* the court that it was motivated by the reason it provides; rather it must simply articulate an explanation that, if true, would connote lawful behavior." *Id.* (citation omitted). Defendants have satisfied this burden by proffering evidence that Conway was demoted because in Leach's judgment, Conway had demonstrated inappropriate behavior as a manager by engaging in a relationship with a direct report, showed poor judgment in allowing it to continue without requesting to have the direct report transferred to another team, and failed to disclose the information until threats were made by his subordinate. (Warning Memo, Pl.'s Ex. 7.) In light of the "mistakes [he] made in behavior and judgment, . . . the potential risk to Microsoft," and the violation of Microsoft's policies and guidelines,

Leach made his decision to demote Conway. (*Id.*) It is not in dispute that Conway engaged in the behavior underlying Leach's disciplinary decision. Demotion for inappropriate behavior disallowed under company policy is clearly a legitimate, nondiscriminatory business reason. *See, e.g.*, *Shumway*, 118 F.3d at 65; *Moree v. Frank H. Reis, Inc.*, 2001 WL 736810, at *6 (S.D.N.Y. June 25, 2001) (finding plaintiff's violation of company confidentiality policy sufficient to support defendant's showing of legitimate nondiscriminatory reason for demotion); *Lumpkin v. H.E.L.P. USA*, 2005 WL 839669, at *6 (E.D.N.Y. Jan. 7, 2005) (finding that the defendant articulated legitimate nondiscriminatory reason for demotion of the plaintiff in part based on evidence that the plaintiff's management style created conflicts with other employees).

### iii. Pretext

Once a defendant has satisfied its burden of producing a legitimate nondiscriminatory reason for its employment decision, "the plaintiff has an opportunity to show that the reason was merely a pretext for discrimination. Pretext may be demonstrated either by presentation of additional evidence showing that the employer's proferred explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994) (internal quotation marks omitted) (quoting *Burdine*, 450 U.S. at 256; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)). At this stage, the court must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against plaintiff.'" *Woodman*, 411 F.3d at 76 (citing *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000); *Reeves*, 530 U.S. at 143). Conway's evidence in support of his

17

discrimination claim consists entirely of his allegations of disparate treatment, assumed for purposes of his prima facie case to raise an inference of discrimination. A close examination of these allegations reveals that Conway's prima facie case is weak at best, and there is no "additional evidence" offered to show that Microsoft's legitimate reason for demoting Conway is false. Therefore, as a matter of law, Conway has failed to carry his "ultimate burden."

A.  Melissa Bodenstaff

Conway argues that Bodenstaff is a similarly situated employee who was not disciplined despite engaging in comparable conduct. Conway's position is that Bodenstaff engaged in conduct comparable to his own, because she engaged in a relationship with a subordinate for months prior to revealing it, just as Conway had, and therefore Microsoft's legitimate reason is pretextual. However, Conway's argument fails for two reasons. First, he does not adduce any evidence to show that Microsoft in fact believed in 2003 that Bodenstaff had violated the Employment of Relatives policy. Second, even with full knowledge of Bodenstaff's prior relationship with Allred, the circumstances surrounding that relationship and their joint disclosure are significantly different from those of Conway's.

Despite the fact that Bodenstaff and Allred have since admitted that they had kissed and hugged on a few occasions prior to coming forward, Conway has not made any showing that Microsoft or Leach had any knowledge of this prior physical contact at the time they made the initial decision to transfer Allred and to commend, not discipline Bodenstaff. Absent credible evidence that Microsoft knew of any alleged misconduct, Conway cannot make a showing that defendants' legitimate nondiscriminatory reason

justifying a difference in treatment in 2003 is pretextual. Ultimately, the relevant issue is Leach's understanding of the circumstances surrounding Bodenstaff and Allred's disclosure at the time, because it is the employer's state of mind that the disparate treatment inquiry purports to evince. *Shumway*, 118 F.3d at 64–65; *Woodman*, 411 F.3d 69. The testimony of Leach, Bury, Bodenstaff and Allred all supports defendants' position that Bodenstaff and Allred did not disclose that there had been any prior intimate encounters between them and that Leach and Bury had no reason to believe otherwise. (Leach Dep. 44:11–45:04, Pl.'s Ex. 4; Bury Dep. 130:06–18, Pl.'s Ex. 6; Bodenstaff Dep. 95:02–14, 98:03–25, Pl.'s Ex. 12; Allred Dep. 217:22–218:12, 221:18–21, Pl.'s Ex. 13.) Conway does not offer any proof that this testimony is false. Conway instead bases his allegation that Microsoft in fact knew that Bodenstaff and Allred had already commenced a relationship based on a statement contained in a memorandum addressed to Ms. Gutierrez of the EEOC in regards to the aforementioned complaint lodged by Conway following his resignation: "Ms. Bodenstaff brought her romantic relationship with Mr. Allred to Mr. Leach's attention soon after it began, *while it was underway*, and under no cloud of an anticipated complaint against her from Mr. Allred." (Mem. from Elizabeth K. Maurer, Microsoft Corporate Attorney, to Esther Gutierrez, Investigator, EEOC, New York District Office (Jan. 15, 2004) ("Maurer Memo") 7, Pl.'s Ex. 23 (emphasis added); *see also* Pl.'s Opp'n Mem. 10.)[2] Conway's argument with respect to Microsoft's knowledge at the time of the May 2003 disclosure is undermined, however, by his own submission to this Court, which contains the following "undisputed material facts":

---

[2] Elsewhere in the same memorandum, Bodenstaff's conduct is described as follows: "In May of 2003, when Ms. Bodenstaff and Mr. Allred realized they were attracted to one another and wished to date, they reviewed Microsoft's policies. Following the guidance of Microsoft's Employment of Relatives policy, they went to Human Resources and to Mr. Leach, their next level manager, and explained the situation." (Maurer Memo 6).

19

- Bodenstaff had a few intimate encounters with her subordinate, Allred, beginning in February 2003, and did not disclose these encounters when asked about them by Bury in May 2003. (Pl.'s Counterstatement of Undisputed Material Facts ("Pl.'s Counterstatement") ¶ 9.)
- Bodenstaff lied to Human Resources when Bury asked Bodenstaff and Allred if anything had occurred between them and they said "no." (*Id.* at ¶ 10.)
- Bury said to both Allred and Bodenstaff, that most people wait until they are in trouble before they come forward . . . . (*Id.* at 37.)
- Allred did not tell Bury that he had already kissed Bodenstaff, and neither did Bodenstaff. (*Id.* at ¶ 38.)

Thus, Conway has not submitted evidence of a type that would persuade a reasonable jury that defendants had knowledge of a preexisting relationship between Bodenstaff and Allred in May 2003. *See Dawson*, 373 F.3d at 272 (citing *Anderson*, 477 U.S. at 252). Indeed, the undisputed direct evidence proffered by plaintiff is that at the time the decision was made, defendants believed that there was no violation of the policy by Bodenstaff, and that she admirably came forward to comply with company policy. (*See* Pl.'s Counterstatement ¶ 37 ("Bury said to both Allred and Bodenstaff, that most people wait until they are in trouble before they come forward; that Allred and Bodenstaff were the first people that ever came forward before they got caught; and that Bury was surprised [that Bodenstaff and Allred are meeting with her] because no one ever comes forward.") (bracketed language in original).)

In *Shumway*, the plaintiff was discharged for violating defendant-employer's no-fraternization rule. The plaintiff failed to satisfy her prima facie burden because she could not prove circumstances giving rise to an inference of discriminatory animus. Notably, the Second Circuit stated that "[i]t is impossible to demonstrate that [the defendant] treated similarly situated males differently when there is no evidence [the

defendant] knew about any other violations of the 'no fraternization' rule." *Shumway*, 118 F.3d at 64–65. Here, Conway has similarly failed to bring forth evidence that Microsoft knew of any violation by Bodenstaff of its own fraternization policy in May 2003. Plaintiff, therefore, has failed to raise a material issue of fact regarding Leach's alleged discriminatory intent. (Leach Dep. 44:02–45:04, Pl.'s Ex. 4.) Put simply, "a defendant's discriminatory intent cannot be inferred . . . from circumstances unknown to the defendant." *Woodman*, 411 F.3d 69; *cf. Geraci v. Moody-Tottrup, Int'l Inc.*, 82 F.3d 578, 581 (3d Cir. 1996) ("[I]t is counter-intuitive to infer that an employer discriminated on the basis of a condition of which it was wholly ignorant.").

The fact that the factual determination underlying defendants' conclusion has since been *arguably* proved incorrect does not alter the analysis. In *Graham*, the plaintiff was discharged after failing a drug test. The plaintiff argued that his employer's allegation that he was discharged for failing the test was pretext because in fact, the results of his test were incorrect. The Second Circuit, however, held that the relevant question was not whether the test results were in fact correct, but rather "whether it was *reasonable* for the employer to rely on the test result in making its employment decision." *Graham*, 230 F.3d at 44. The court found that because there was no evidence to suggest the employer purposefully interfered with the testing process in order to discriminate against plaintiff, a reasonable jury could only conclude the employer's reliance was reasonable. *Id.* Here, Conway has not offered evidence to show that defendants' reliance on Bodenstaff and Allred's statements at the time of their disclosure was in bad faith. As discussed above, the circumstances were such that Leach and Bury had every reason to believe them, since they were coming forward at a time when they

were at no risk of being "caught," and no dispute had at that point arisen between them. While Conway now argues that Microsoft should have independently investigated Bodenstaff's relationship with Allred given the nature of their disclosure, it is not disputed that Conway's version of events leading up to his disclosure were also taken at face value by Leach, even though Conway did not disclose the full extent of his relationship with Quirke. (*See* Warning Memo, Pl.'s Ex. 7 (describing relationship between Conway and Quirke "according to [Conway's] own description and timeline," and including only two of the three sexual encounters now on record); Leach Dep. 137:07–19, Pl.'s Ex. 4.) Thus there is no evidence of disparate treatment with respect to the defendants' procedures for addressing disciplinary issues. While plaintiff may wish to criticize these procedures, "courts must be careful not to second guess an employer's judgment that it makes in good faith." *Gallo v. Prudential Residential Servs., Ltd. P'Ship*, 22 F.3d 1219, 1226 (2d Cir. 2001).

Finally, even with full knowledge of Bodenstaff's pre-disclosure physical contact, the context and circumstances of Bodenstaff's alleged policy violation are sufficiently different from Conway's to preclude a finding that they were similarly situated. These differences, irrespective of defendants' knowledge, are sufficient to prevent plaintiff from carrying his burden of showing intentional discrimination. *See Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 250 (S.D.N.Y. 2001) (finding that the plaintiff failed to show pretext because his misconduct was "by far, 'the most egregious,'" and therefore there existed "such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it"), *reconsideration denied*, 156 F. Supp. 2d 270 (S.D.N.Y. 2001), *aff'd*, 51 Fed. Appx. 55 (2d Cir. 2002) (unpublished decision);

*Pierce v. Netzel*, 2004 WL 1055959, at *13 (W.D.N.Y. May 10, 2004) (citing *Shumway*, 118 F.3d at 64) (noting that part of "all material respects" standard is requirement that there not exist "any differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it"). Conway does not dispute that Bodenstaff and Allred had not engaged in any physical contact beyond hugging and kissing at the time of coming forward. By contrast, Conway and Quirke had a sexual relationship. Secondly, Bodenstaff and Allred came forward together after they had mutually determined that their relationship would continue and develop, and *before* any conflict in the work setting had arisen between them. Their testimony reflects that they were motivated by a desire to comply with company policy and to avoid complications that could arise from a relationship between a manager and direct report. Ultimately, Bodenstaff's conduct only *arguably* violates Microsoft's Employment of Relatives policy, if at all. Indeed, Bodenstaff and Allred appear to have revealed their desire to embark on a relationship to their employer as soon as was reasonable. In stark contrast, Conway came forward many months after the relationship had ended, after hiding it in violation of a policy that the development of such relationships must be reported. Conway further concedes that he only finally decided to come forward as a result of Quirke's threats to tell Leach first following a dispute over her evaluation. When a plaintiff's misconduct is objectively more serious than that of a proposed comparator, differential treatment by the employer does not create an issue of fact that will defeat a motion for summary judgment. *See, e.g., Graham*, 230 F.3d at 40; *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 568 (2d Cir. 2000) (holding that the plaintiff failed to "create a jury question on pretext" because she could not show comparable conduct by proposed

23

comparators, where she "engaged in a physical fight, while the other employees'

behavior—-offensive though it may have been—involved words only"); *Shumway*, 118

F.3d at 64 (finding that the plaintiff was not similarly situated with co-employees in "all

material respects" where it could not be shown that anyone else had a relationship of

comparable type and duration or had a "complaint regarding his conduct brought against

him and then lied about the conduct when confronted"); *Tomasino v. Mt. Sinai Med. Ctr.*

*& Hosp.*, 2003 WL 1193726, at *14 (S.D.N.Y. Mar. 13, 2003) (granting summary

judgment where plaintiff had medicated a patient without a doctor's order, and none of

her proposed comparators' infractions were as serious); *Khan v. Costco Wholesale, Inc.*,

2001 WL 1602168, at *7 (E.D.N.Y. Dec. 13, 2001) (finding, in Section 1981 action, that

the plaintiff failed to show that his co-workers were similarly situated where none of their

acts of theft were "of the magnitude" of his); *Albury v. J.P. Morgan Chase*, 2005 WL

746440, at *10 (S.D.N.Y. Mar. 31, 2005) (M.J. Pitman) (finding proposed comparators

not similarly situated because their infraction of the employer's policy against accessing

confidential information "did not rise to the same level of seriousness as plaintiff's").[3]

### B.    Ray Ivey

As with Bodenstaff, Conway cannot show that Ivey is similarly situated, and

therefore cannot rely on Ivey's retention of his managerial position as evidence of

---

[3] As an additional ground on which to find Bodenstaff to be similarly situated, Conway further argues that Bodenstaff violated Microsoft's General Company Guidelines (Pl. Ex. 22) when she allegedly harassed Allred, threatened him with termination, and harassed his ex-wife. (Pl. Opp'n Mem. 8). There is nothing in the record to sustain these allegations. Based on the testimony on the record, Bodenstaff spoke with Mrs. Allred in July 2004. (Bodenstaff Dep. 58:7–8, Pl. Ex. 12). From what scant testimony there is relating to this conversation, the subject of their discussion related to Mrs. Allred having her husband and Bodenstaff fired. (*Id.* at 147:2-4). Conway offers no evidence to support an allegation that Bodenstaff threatened Allred or his wife. Furthermore, the testimony that no one at Microsoft had any knowledge of any of the threatening and harassing conduct now alleged by Conway is not disputed. (*Id.* at 58:6–59:8; Turman Dep. 22:11 18, Pl. Ex. 5). There is nothing on the record to support an argument that these violations of company policy occurred, that they were brought to the attention of Defendants prior to discovery in this matter, or that they were of a type to support a showing that Bodenstaff and Conway were similarly situated.

discrimination on the part of Microsoft. First, Conway has not produced evidence to support a finding that Conway and Ivey were subject to the same workplace standards. In the Second Circuit, whether or not co-employees report to the same supervisor is an important factor in determining whether two employees are subject to the same workplace standards for purposes of finding them similarly situated. In *Shumway*, for example, the court noted that the plaintiff's proposed comparators did not report to the same supervisor in concluding that they were not similarly situated. 118 F.3 at 64; *see also Albury*, 2005 WL 746440, at *10 (finding alleged comparator not similarly situated where record showed co-worker worked in different department, had different job title, and different supervisor); *Gambrell v. Nat'l R.R. Passenger Corp.*, 2003 WL 282182, at *7 n.12 (S.D.N.Y. Feb. 3, 2003) (finding that when plaintiff reports to "wholly different supervisors" the strength of the inference different treatment raises is "greatly weaken[ed]"); *Khan*, 2001 WL 1602168, at *7 (granting summary judgment to employer at prima facie stage, in part because the plaintiff failed to show that his proposed comparators were supervised by the same person that had terminated him). Although the *Graham* Court refined the "all material respects" analysis it previously adopted in *Shumway*, "reporting to different supervisors continues to be important to the similarly situated analysis, even in the wake of *Graham*." *Gambrell*, 2003 WL 282182, at *7 n.12 (citing *Gonzalez v. N.Y. City Trans. Auth.*, 2001 U.S. Dist. LEXIS 5908, at *57 (S.D.N.Y. May 9, 2001) and *Ramos v. Marriot Int'l, Inc.*, 134 F. Supp. 2d 328, 340 (S.D.N.Y. 2001) for proposition that courts consider whether co-employees share a supervisor in determining whether they are subject to same workplace standards); *see also Spiegler v. Israel Discount Bank of New York*, 2003 WL 21983018, at *2 (S.D.N.Y. Aug. 19, 2003)

(finding plaintiff and comparators not similarly situated, *inter alia*, because there was no evidence they dealt with the same supervisor, and further noting that finding was "not incompatible with . . . *Graham*"). In this case, Ivey worked in a different group, and did not report to Leach. A different decisionmaker was responsible for investigating and determining how to discipline Ivey with respect to his harassment of Quirke. (*See* Ivey Letter, Pl.'s Ex. 25 (showing that Sharon Boland and Mary Stokes were the decisionmakers with respect to Quirke's complaint against Ivey).) Indeed, Leach did not even know prior to August 2003 that Ivey had sexually harassed Quirke, or how he was disciplined.

Furthermore, even if Ivey and Conway were subject to the same workplace standards, their conduct is not comparable. Conway violated Microsoft policy by engaging in a sexual relationship with a direct report, and by failing to come forward or request reassignment until his subordinate threatened to expose him unless he revised her evaluation. Although Ivey's conduct is far from admirable, it is materially different from Conway's. *See Cruz*, 202 F.3d at 568; *Albury*, 2005 WL 746440, at *10 (finding proposed comparator accused of sexual harassment "not even remotely comparable" to the "plaintiff's actions in accessing confidential account information" for purposes of raising inference of discrimination). Ivey was accused of sexually harassing Quirke. Specifically, she complained that he had inappropriately put his arm around her, and said sexualized and offensive things to her at an off-site work function. Where co-employees are disciplined differently for conduct that is fundamentally different in quality, there is no "objectively identifiable basis for comparison" to allow a finding that they are similarly situated. *Graham*, 230 F.3d at 40.

For the foregoing reasons, Conway's evidence with respect to Bodenstaff and Ivey are legally insufficient to support a finding that Microsoft's stated reasons for his demotion are pretextual. As such, his disparate treatment claim cannot succeed.

### b. *Retaliation and Constructive Discharge*

In order to make out a prima facie case of retaliation, Conway must demonstrate (1) participation in a protected activity known to the employer; (2) an employment action disadvantaging the person engaged in the protected activity, and (3) a causal connection between the protected activity and the adverse employment action. *See Cruz*, 202 F.3d at 566. "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Id.* (citing 42 U.S.C. § 2000e-3). To establish that activity is protected, a plaintiff "'need not prove the merit of his underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed.'" *Knight v. City of New York*, 303 F. Supp. 2d 485, 496 (S.D.N.Y. 2004) (citing *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)). "Informal as well as formal complaints constitute protected activity." *Id.* (citing *Sumner*). The first element also requires that "the complainant must [have] put the employer on notice that the complainant believes that discrimination is occurring." *Ramos v. City of New York*, 1997 WL 410493, at \*3 (S.D.N.Y. July 22, 1997). An adverse employment action is a "materially adverse change in the terms and conditions of employment." *Knight*, 303 F. Supp. 2d at 496 (citing *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). There is no bright-line rule for determining whether an employment action is adverse, but it is not limited to demotion and discharge. *Id.* However, materially adverse changes in working conditions "must be more disruptive

27

than a mere inconvenience or an alteration of job responsibilities." *Id.* Finally, a causal connection may be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or . . . (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Id.* (citations omitted).

A brief reiteration of the relevant background facts will be useful in addressing these claims. Conway was informed of his demotion on September 4, 2003. On September 8, 2003, he filed an internal complaint that alleged Quirke sexually harassed him. Also subsequent to being informed of his demotion, he complained to Leach that other managers (specifically Bodenstaff and Ivey) had relationships with employees and kept their jobs. In late September to early October, Conway experienced technical difficulties which he alleges were purposefully caused by Microsoft to make him appear incompetent. Believing he was about to be fired, Conway submitted his resignation on November 7, 2003, effective November 14, 2003.

Only the September 8 sexual harassment claim and the more informal complaint of disparate treatment may be considered protected activity for purposes of Conway's retaliation claim, since Conway had already resigned at the time he filed his EEOC complaint. Defendants argue that Conway has failed to prove that he engaged in a protected activity, because he "could not have had a reasonable good faith belief that any of his subordinate's alleged behavior constituted a violation of the law." (Defs.' Supp. Mem. 17.) First, although a complaint of sexual harassment based on a hostile or offensive working environment rarely involves an harassment by a subordinate of her supervisor,[4] the Court does not need to find that the claim had merit as a matter of law,

---

[4] Under Title VII two forms of sexual harassment are recognized. Quid pro quo harassment "involves the conditioning of concrete employment benefits on sexual favors," while hostile environment harassment

28

but only that it was brought in good faith. *See Knight*, 303 F. Supp. 2d at 496. Despite the fact that Conway never pursued his claim of sexual harassment against Quirke, there is no reason to suspect he did not bring his complaint in good faith and with the reasonable belief that Quirke had sexually harassed him in violation of Title VII. Microsoft took his claim seriously and investigated it without questioning his motivation. (*See* E-mail from Tracy Turman to Todd Conway and Cullene Bury (Sept. 9, 2003, 5:56 PM), Defs.' Ex. 9; Mem. from Tracy Turman to Todd Conway (Oct. 28, 2003), Defs.' Ex. 10.) There can be no dispute that Microsoft was aware of his complaint, since it was lodged internally and addressed by human resources. (*Id.*)

Furthermore, Conway's complaint of disparate treatment following his demotion also constitutes protected activity. Although the Court does not find Conway has fulfilled his burden with respect to that claim for the reasons discussed above, there is no reason to doubt that the complaint was made in good faith. The fact that the complaint was not formally lodged is irrelevant. *See Knight*, 303 F. Supp. 2d at 496. That Microsoft was aware of his complaint is not disputed. (E-mail from Tom Leach to Cullene Bury (Sept. 12, 2003, 12:32 PM), Pl.'s Ex. 11.) Therefore, Conway has satisfied the first element of his retaliation claim.

With respect to an adverse employment action, Conway argues that after he "complained about Defendants' disparate treatment, Defendants retaliated against him and made his work environment intolerable, causing him to be constructively discharged from his employment." (Pl.'s Opp'n Mem. 2.) "[A]n employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates

---

does not involve economic benefits, but "creates a hostile or offensive working environment." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 62 (1986). Logically, quid pro quo harassment is not possible here because Quirke had no ability to alter Conway's employment benefits.

29

a work atmosphere so intolerable that he is forced to quit involuntarily." *Petrosino v. Bell Atl.*, 285 F.3d 210, 229 (2d Cir. 2004) (citing *Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir. 2003)). "Case law generally focuses on two parts of this standard: the employer's intentional conduct and the intolerable level of the work conditions." *Id.* A work environment is considered intolerable for purposes of constructive discharge when it is "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Timothy v. Our Lady of Mercy Med. Ctr.*, 2005 WL 33112054, at \*7 (S.D.N.Y. Dec. 6, 2005) (citing *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004); *Kirsh v. Fleet Street, Ltd.*, 148 F.3d 149, 161 (2d Cir. 1998)). With respect to the intent requirement, the plaintiff must show that the employer engaged in deliberate action. *Wright v. Goldman, Sachs, & Co.*, 387 F. Supp. 2d 314 (S.D.N.Y. 2005) (citing *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir. 2000)). As an initial matter, the inconvenience and frustration of Conway's technical difficulties, without more, do not support a finding that his work environment was rendered "intolerable." *See, e.g., Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993) (holding that mundane assignments, harsh treatment from supervisor, and alleged demotion did not constitute constructive discharge); *Green v. Harris Publ'ns*, 331 F. Supp. 2d 180 (S.D.N.Y. 2004) (finding transfer of plaintiff to undesirable position after subjecting him to racial slurs and other insensitive language does not constitute constructive discharge); *Garrett v. Mazza*, 2005 WL 2094955, at \*5 (S.D.N.Y. Aug. 30, 2005) (noting that absence of change in compensation cuts against a finding of constructive discharge).

Even if Conway could show that his work environment would have caused "a reasonable person in [his] shoes" to feel compelled to resign, he has not carried his burden with respect to showing defendants' intent. Conway offers no evidence in support of his allegation that Microsoft deliberately caused his technical problems. His conclusory statements stating his belief that Microsoft acted deliberately in retaliation are simply insufficient to raise a genuine issue for trial. In opposing a motion for summary judgment, "the non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *Woodman*, 411 F.3d at 75 (internal quotation marks and citations omitted). Defendants' motion for summary judgment with respect to Conway's constructive discharge claim must therefore be granted. And absent a showing of constructive discharge, plaintiff cannot demonstrate the existence of an adverse employment action necessary to support a claim of retaliation. Consequently, both the constructive discharge and retaliation claims fail.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment [17] is granted. The Clerk of the Court is directed to close this case.

SO ORDERED

Dated:   New York, New York
         February 14, 2006

Richard J. Holwell
United States District Judge

31